IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| ISIDRO DURAN-VELAZCO, | Case No. 1:22-MJ-119 |
| JOSE COVARRUBIAS-GONZALEZ, | **FILED UNDER SEAL** |
| CLAUDIA SALINAS-MORENO, | |
| CARLOS RAMIREZ-CORTEZ, | |
| and | |
| JORGE OROZCO-SANDOVAL, | |
| *Defendants*. | |

**AFFIDAVIT IN SUPPORT OF A
CRIMINAL COMPLAINT AND ARREST WARRANTS**

I, Steven M. Kahle, being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      This affidavit is submitted in support of a criminal complaint and arrest warrants charging Isidro DURAN-VELAZCO, Jose COVARRUBIAS-GONZALEZ, Claudia SALINAS-MORENO, Carlos RAMIREZ-CORTEZ, and Jorge OROZCO-SANDOVAL with knowingly, intentionally, and unlawfully conspiring to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846.

2.      I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7).  As such, I am empowered to conduct investigations of, and to make arrests for offenses enumerated in 18 U.S.C. § 2516.  As pertains to this case, I have the authority to conduct Title 21 investigations and enforcement activities.

3.      I am Task Force Officer (TFO) with Drug Enforcement Administration (DEA) and have been so since April 2019.  I currently am assigned to the DEA Resident Office Group 45 in Winchester, Virginia.  Prior to my current assignment, I was assigned as an investigator to the Northwest Virginia Regional Gang and Drug Task Force ("NVRGDTF").  I have been a Deputy Sheriff with the Frederick County (Virginia) Sheriff's Office since 2008.

4.      As a sworn law enforcement officer in the Commonwealth of Virginia, I have completed a sixteen-week basic training course at the Rappahannock Regional Criminal Justice Academy.  During this time, I learned the methods narcotics traffickers use to manufacture, package, sell, and conceal controlled substances.  I also learned about the source countries and source cities for different types of controlled substances and the various methods used by narcotics traffickers to transport controlled substances from source countries and source cities to and within different parts of the United States.  Additionally, I learned about narcotics trafficking conspiracies and the different roles that individuals play in these conspiracies.

5.      While assigned to the NVRGDTF from 2012 until 2019, I investigated multijurisdictional narcotics conspiracy cases in Virginia; orchestrated controlled purchases of narcotics; and developed, managed, and debriefed confidential informants.  I performed as an undercover officer making undercover purchases of heroin, LSD, ecstasy, cocaine, crack cocaine, methamphetamine, and prescription pills.  Additionally, I have written affidavits in support of

2

search warrants and court orders for persons, physical premises, vehicles, cell phones, cell phone records, and location data, to include cell phone GPS data and vehicle trackers. During this time, I conducted regular debriefs of confidential informants, narcotics users, and narcotics traffickers. During this time, I also participated in Title III wire intercept investigations by monitoring the electronic wire intercept, and conducting surveillance related to information gathered from wire intercepts.

6.     As a DEA Task Force Officer, I have participated in multiple criminal investigations of Title 21 violations and received additional training. In early 2020, I attended training on Title III wiretaps, which was sponsored by the DEA's Washington Division. I have written and been the affiant on Title III wiretaps in the past and I have testified under oath in criminal matters and in front of the grand jury. I have been involved in investigations that have resulted in the arrests and convictions of numerous individuals responsible for narcotics trafficking. I have been involved in complex, cross-jurisdictional investigations into large-scale narcotics trafficking organizations. As a result, I have experience in debriefing criminal defendants, witnesses, and other people with direct experience in the methods used to distribute controlled substances. This affidavit does not contain every fact known to me regarding this investigation, but rather contains information necessary to demonstrate probable cause in support of the above-referenced criminal complaint and arrest warrant. The facts and information contained in this affidavit are based on my personal knowledge and information obtained from other law enforcement officers.

7.     This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

**PROBABLE CAUSE**

8.     In and around June 2021, law enforcement developed information through confidential sources and an ongoing investigation that there was a cocaine dealer, unindicted co-conspirator 1 ("UCC-1") operating in and around Marshall, Virginia, which is in Fauquier County, within the Eastern District of Virginia. Sometime thereafter, at the direction of law enforcement, a confidential source ("CS-1") contacted UCC-1 and arranged to purchase approximately 4.5 ounces of powder cocaine.

9.     On or about June 28, 2021, CS-1 met with UCC-1, and together they traveled to another location in Marshall for the drug transaction. CS-1 provided UCC-1 with $9,000 in government funds to conduct this transaction. Once at this location, UCC-1 met with **Isidro DURAN-VELAZCO**, who provided UCC-1 with the 4.5 ounces of powder cocaine, which UCC- 1 then provided to CS-1 in exchange for the $9,000. The 4.5 ounces of cocaine was packaged inside of four individual clear plastic bags. Formal analysis of the substance revealed that it was, in fact, cocaine.

10.     On or about July 21, 2021, at the direction of law enforcement CS-1 again contacted UCC-1 and arranged to conduct a controlled purchase of approximately five ounces of cocaine. That same day, CS-1 met with UCC-1, and together they traveled to a location in Marshall. CS-1 provided UCC-1 with $9000 in government funds to conduct this transaction. Once at this location, UCC-1 again met with **DURAN-VELAZCO**, who provided UCC-1 with the five ounces

4

of cocaine, which UCC-1 then provided to CS-1. The 5 ounces of cocaine was packaged inside of three individual plastic bags. Formal analysis of the substance revealed that it was, in fact, cocaine.

11.     On or about August 31, 2021, at the direction of law enforcement, CS-1 again contacted UCC-1 and arranged to conduct a controlled purchase of approximately two ounces of cocaine. The same day, CS-1 met with UCC-1, and together they traveled to a location in Marshall. CS-1 provided UCC-1 with $3600 in government funds to conduct this transaction.

12.     By this time, law enforcement had identified cell phone numbers for both UCC-1 and **DURAN-VELAZCO** and had obtained pen register/trap-and-trace and GPS "ping" data for both phones.  Once CS-1 and UCC-1 arrived at the location, call detail record analysis along with ping data indicated that UCC-1 met with **DURAN-VELAZCO**, who provided UCC-1 with the two ounces of cocaine, which UCC-1 then provided to CS-1. The two ounces of cocaine was packaged inside of a plastic bag. Formal analysis of the substance revealed that it was also cocaine.

13.     Thereafter, law enforcement developed another confidential source ("CS-2"), who was able to purchase cocaine directly from **DURAN-VELAZCO**.  On or about December 1, 2021, at the direction of law enforcement, CS-2 contacted **DURAN-VELAZCO** and arranged to conduct a controlled purchase of approximately 6.5 ounces of cocaine.  **DURAN-VELAZCO** advised CS-2 that he would be sending an unidentified male subject ("UM-1") to meet with CS-2 at the agreed-upon location in Stafford, Virginia, which is in the Eastern District of Virginia.

14.     A short time later, UM-1 arrived at the agreed-upon location.  UM-1 was using a phone number that law enforcement had previously identified as being used by **DURAN-VELAZCO** and was driving a vehicle known to belong to **DURAN-VELAZCO**.  UM-1 provided CS-2 with the 6.5 ounces of cocaine, packaged in four individual clear plastic bags, in exchange

for $10,000 in government funds.  At the completion of the transaction, law enforcement observed that UM-1 drove back to **DURAN-VELAZCO**'s residence.  Formal analysis of the substance revealed that it was also cocaine.

*Introduction of the UC and Identification of SALINAS-MORENO*

15.     During the course of the investigation, CS-2 introduced an undercover law enforcement agent ("UC") to **DURAN-VELAZCO**.  On or about December 13, 2022, CS-2 and the UC arranged to purchase eight ounces of cocaine from **DURAN-VELAZCO** at a location in Stafford.  CS-2 and the UC met with **DURAN-VELAZCO** and provided him with $12,000 in government funds, and **DURAN-VELAZCO** provided CS-2 with the eight ounces of cocaine, packaged in two clear plastic bags.  Formal analysis of the substance revealed that it was also cocaine.

16.     On or about January 25, 2022, the UC arranged to meet **DURAN-VELAZCO** in Catlett, Virginia, within the Eastern District of Virginia, to purchase five ounces of cocaine. **DURAN-VELAZCO** then informed the UC that he would be sending a female subject—later identified as **Claudia SALINAS-MORENO**—to meet with the UC.

17.     That day, **SALINAS-MORENO** arrived at the meeting in Catlett in **DURAN-VELAZCO**'s vehicle.  Once there, **SALINAS-MORENO** provided the UC with approximately five ounces of cocaine, packaged in three individual clear bags, in exchange for $8,000 in government funds.  Formal analysis of the substance revealed that it was also cocaine.

18.     During the course of the investigation, law enforcement obtained authorization to intercept both wire and electronic communications on two of **DURAN-VELAZCO**'s telephones. On or about February 6, 2022, law enforcement intercepted a conversation (in Spanish) between

6

**DURAN-VELAZCO** and **SALINAS-MORENO** in which **DURAN-VELAZCO** asked **SALINAS-MORENO** to deposit suspected cash drug proceeds into his bank account. The following conversation occurred, as translated from Spanish to English:

> D-V:   I was going to ask if you wanted to come for the card so you can go deposit some money in the bank.
>
> S-M:   Well, if you want me to, I'll go by.
>
> D-V:   So you…come by, please, okay? To do me the favor. Get the card and go put some money in the bank, alright? I have it there.
>
> S-M:   Okay.
>
> D-V:   Alright, yeah. Anyway, if I'm not there you already know where it is; there in the jacket, the black one or the gray sweatshirt. Everything is there. . . . five.
>
> S-M:   Does the ATM let you put in so much?
>
> D-V:   I don't remember how much it lets you put in but it shouldn't be more than 2,000. But . . . look, look, put in a chunk, put in a chunk, and then take out the card, take out the card . . . and like 20 minutes later you can put another chunk in.
>
> S-M:   [*acknowledged*]
>
> D-V:   If not, if not, just change banks. Because they might cancel it. That's what they told me. You can't put everything in the same one at fucking once because they will cancel it.

19.    Thereafter, law enforcement surveilled **SALINAS-MORENO** travel from Manassas, Virginia, to the area around **DURAN-VELAZCO**'s residence in Catlett. In a subsequent conversation, law enforcement intercepted **SALINAS-MORENO** and **DURAN-VELAZCO** discussing the cash that **SALINAS-MORENO** had picked up from **DURAN-VELAZCO**'s house, as well as the wire transfer service Elektra, which allows users to wire money from the United States to Mexico. The next day, law enforcement intercepted a call in which **SALINAS-MORENO** told **DURAN-VELAZCO** that she had made the deposit.

## *Identification of COVARRUBIAS-GONZALEZ*

20.     During the course of the investigation, law enforcement obtained authorization to intercept both wire and electronic communications on two of **DURAN-VELAZCO**'s telephones. On or about November 22, 2021, law enforcement intercepted a conversation between **DURAN-VELAZCO** and two male subjects sharing the phone number (xxx) xxx-8740.   In this conversation, the three men discussed picking up a quantity of cocaine at one of their residences.

21.     Thereafter, law enforcement tracked down **DURAN-VELAZCO** in his vehicle in Upperville, Virginia, and began surveilling him to attempt to identify his source of supply.   At approximately 12:36 p.m. on November 22, 2021, **DURAN-VELAZCO** turned left onto Old Carters Mill Road in Fauquier County.   At approximately 12:40 p.m., **DURAN-VELAZCO** sent a text message to (xxx) xxx-8740, stating (as translated from Spanish to English), "Dude, where should I leave your money."   Then, after he received no response, **DURAN-VELAZCO** sent another text saying, "Dude, I left it next to your truck in the roller" followed by "300."   Based on this exchange, investigators determined that **DURAN-VELAZCO**'s source of supply lived in the area of Old Carters Mill Road.

22.     On or about November 28 and 29, 2021, law enforcement intercepted calls between **DURAN-VELAZCO** and the sole male user of (xxx) xxx-8740.   During the call on November 28, **DURAN-VELAZCO** advised the male subject that he would need "seven" for Wednesday, and "one" for right now.   **DURAN-VELAZCO** advised that he was around Warrenton, Virginia, and the two men agreed to meet soon.   Based on my training and experience, and my familiarity with this investigation, I understand **DURAN-VELAZCO** to have requested that the male subject provide him with a quantity of narcotics for sale.   During the call on November 29, 2021, **DURAN-**

8

VELAZCO and the male had a conversation about the quality of the cocaine that **DURAN-VELAZCO** picked up the day before. **DURAN-VELAZCO** stated, "The guy says it didn't, didn't come out the same as the other one." When the user of (xxx) xxx-8740 responded, "It's the same one," **DURAN-VELAZCO** replied, "I told him.  He says it isn't.  He said, 'No, dude,' he said, 'No, no, no . . . The efficiency is not the same.'  He said, 'It came out bad, it comes out bad.'" Based on training, experience, and knowledge of this case, investigators believe that one of **DURAN-VELAZCO**'s customers had complained to **DURAN-VELAZCO** about the quality of the cocaine that **DURAN-VELAZCO** had purchased from the user of (xxx) xxx-8740 (later identified as **Jose de Jesus COVARRUBIAS-GONZALEZ**.

23.     On or about December 9, 2021, **DURAN-VELAZCO** received a call from (xxx) xxx-4331; **DURAN-VELAZCO** appeared to recognize the caller, who told him "Old man, this is, this is another number."  Investigators directed the Spanish-speaking monitor who listened to the call to compare the voices of the male subjects using (xxx) xxx-8740, and the male subject using (xxx) xxx-4331.  The monitor determined that the caller on (xxx) xxx-4331 was the same as one of the callers on (xxx) xxx-8740 intercepted on November 28 and 29.  Call detail record analysis revealed eight common contacts between (xxx) xxx-8740 and (xxx) xxx-4331, indicating that the phones are used by the same person, who was later identified as **COVARRUBIAS-GONZALEZ**, as described below.

24.     On or about December 15, 2021, law enforcement conducted physical surveillance in the area of Training Barn Road and Old Carters Mill Road near The Plains, Virginia.  Law enforcement observed a house at the intersection of Training Barn Road and Smitten Farm Lane with two garage doors on the left side of the residence.  One of the garage doors was open, which

9

allowed law enforcement to observe a maroon SUV parked inside. The vehicle was registered to **COVARRUBIAS-GONZALEZ** at the address of the residence.

25. The same day, CS-2 called **DURAN-VELAZCO** and asked for the "same tools," referring to the cocaine he had purchased two days prior. **DURAN-VELAZCO** replied, "I still have it, man. Let me get in touch with him, dude. This guy . . . I need to ask him." Based on this exchange, investigators believe **DURAN-VELAZCO** was referring to his source of supply.

26. The next day, December 16, 2021, law enforcement tracked down **DURAN-VELAZCO** in his vehicle in Marshall, Virginia. During this surveillance, **DURAN-VELAZCO** was observed meeting with a male subject driving a red 1997 Chevrolet pickup truck. The vehicle was registered to **COVARRUBIAS-GONZALEZ** at the same address on Training Barn Road. The man driving the red pickup truck was positively identified as **COVARRUBIAS-GONZALEZ** based on a comparison to Maryland Motor Vehicle Administration records. Accordingly, law enforcement identified the user of (xxx) xxx-4331 as **COVARRUBIAS-GONZALEZ**.

### *Interception of COVARRUBIAS-GONZALEZ*

27. During the course of the investigation, law enforcement obtained authorization to intercept both wire and electronic communications on **COVARRUBIAS-GONZALEZ**'s second phone, (xxx) xxx-4331.

28. Over the course of February 6–8, 2022, law enforcement intercepted text messages and phone calls between **COVARRUBIAS-GONZALEZ** and an unindicted co-conspirator ("UCC-2") arranging to meet for a suspected drug transaction. In one of the calls, UCC-2 told **COVARRUBIAS-GONZALEZ** that UCC-2 had "one thousand" (believed to be $1,000) and

10

asked if **COVARRUBIAS-GONZALEZ** could let him have the "product." Ultimately, the two men agreed to meet in Stephens City, Virginia, on February 9.

29.     Law enforcement set up surveillance at the planned meeting location on February 9, 2022, and observed **COVARRUBIAS-GONZALEZ**'s red pickup truck in the parking lot. At approximately 8:50 p.m., a red SUV pulled into the parking lot and parked beside **COVARRUBIAS-GONZALEZ**'s truck. Under surveillance, the male driver of the SUV exited the vehicle and approached the driver's side of the truck. The SUV was registered to UCC-2, who was identified as the driver based on a comparison to DMV records.

30.     **COVARRUBIAS-GONZALEZ** and UCC-2 continued their conversation for a few minutes, and then UCC-2 got back into his vehicle, and the two vehicles departed at approximately 9:00 p.m. Based on the intercepted communications and the context of this meeting, investigators believe that **COVARRUBIAS-GONZALEZ** was meeting with UCC-2 for the purpose of selling cocaine to UCC-2.

*Traffic Stop on RAMIREZ-CORTEZ*

31.     On or about February 13, 2022, investigators intercepted communications between **COVARRUBIAS-GONZALEZ** and an individual subsequently identified as **Carlos RAMIREZ-CORTEZ**, as described below. At approximately 11:40 a.m., **RAMIREZ-CORTEZ** texted **COVARRUBIAS-GONZALEZ**, "What's up buddy, I need one ounce." Around 1:18 p.m., **COVARRUBIAS-GONZALEZ** called **RAMIREZ-CORTEZ** and told **RAMIREZ-CORTEZ** that he was working but could meet up on his lunch break. The two men made plans to meet at a parking lot in Winchester. At approximately 2:06 p.m., **RAMIREZ-CORTEZ** called **COVARRUBIAS-GONZALEZ** and told him that he had arrived. Based on

11

my training, experience, and knowledge of this case, I believe that **RAMIREZ-CORTEZ** met up with **COVARRUBIAS-GONZALEZ** on February 13, 2022, to purchase one ounce of cocaine from **COVARRUBIAS-GONZALEZ**.

32.    On or about February 21, 2022, investigators intercepted additional communications between **COVARRUBIAS-GONZALEZ** and **RAMIREZ-CORTEZ**.   The intercepted conversation indicated that **COVARRUBIAS-GONZALEZ** and **RAMIREZ-CORTEZ** were planning to meet the next day so that **COVARRUBIAS-GONZALEZ** could sell cocaine to **RAMIREZ-CORTEZ**.

33.    The next day, February 22, investigators intercepted a call between **COVARRUBIAS-GONZALEZ** and **RAMIREZ-CORTEZ** in which **RAMIREZ-CORTEZ** indicated that he was at the Atoka Market in Marshall, Virginia.  Based on this phone call, in which **COVARRUBIAS-GONZALEZ** directed **RAMIREZ-CORTEZ** to travel to his residence, law enforcement identified a vehicle operated by **RAMIREZ-CORTEZ** and surveilled the vehicle as it traveled to Old Carters Mill Road, to the area of **COVARRUBIAS-GONZALEZ**'s residence.

34.    After **RAMIREZ-CORTEZ** went to **COVARRUBIAS-GONZALEZ**'s residence, deputies from the Frederick County Sheriff's Office attempted to conduct a traffic stop on **RAMIREZ-CORTEZ**'s vehicle.  Once the deputies activated their lights to signal for the vehicle to stop, **RAMIREZ-CORTEZ** made an erratic right turn into the Forest Lake Estates mobile home park, apparently in an attempt to evade being stopped. The deputies briefly lost sight of **RAMIREZ-CORTEZ** before apprehending him at the other end of the street onto which he had turned.

35.     **RAMIREZ-CORTEZ** was the sole occupant of the vehicle.  A narcotics K-9 conducted a free air sniff of **RAMIREZ-CORTEZ**'s vehicle and alerted to the driver's door.  A search of the vehicle was conducted, but law enforcement did not recover any narcotics. Nevertheless, the K-9 alerted two more times specifically to the driver's seat.  Law enforcement did, however, recover a firearm from the center console of the vehicle that **RAMIREZ-CORTEZ** was driving.  Moreover, law enforcement canvassed the road in Forest Lake Estates where the vehicle had traveled and recovered approximately two ounces of cocaine that **RAMIREZ-CORTEZ** had thrown from the vehicle's window.  The cocaine was field-tested, and the preliminary result indicated the presence of cocaine.

*Identification of OROZCO-SANDOVAL*

36.     On or about Saturday, February 19, 2022, law enforcement intercepted a phone call between **COVARRUBIAS-GONZALEZ** and an unidentified male subject ("UM-2").  In the phone call, UM-2 and **COVARRUBIAS-GONZALEZ** discussed meeting so that UM-2 could pick up some "papers," which I believe to be code for money.  UM-2 stated that he was not in the area, but that "Jorge" might go instead.  Later, **COVARRUBIAS-GONZALEZ** and UM-2 had another call in which they discussed pushing the meeting to the next day.  Then, at approximately 6:17 p.m., UM-2 texted **COVARRUBIAS-GONZALEZ**, "Buddy is it okay if I see you on Monday at the same time??"  **COVARRUBIAS-GONZALEZ** responded, "Alright alright." Then, on Monday, February 21, 2022, UM-2 texted **COVARRUBIAS-GONZALEZ**, "Good morning, buddy, is around 2:00 or 3:00 okay"?

37.     Shortly thereafter, **COVARRUBIAS-GONZALEZ** placed a call to (xxx) xxx-6064, the user of which was later identified as **Jorge OROZCO-SANDOVAL**, as described

13

below.  In the phone call, **COVARRUBIAS-GONZALEZ** discussed his prior conversations with UM-2, whom he referred to as their "friend."  The conversation continued:

C-G:   He was coming to visit me.

O-S:   Has he arrived?

C-G:   He told me around 2 or 3.  I just wanted to ask you . . . I do have, have, have, half of it, okay?

O-S:   Okay.

C-G:   Yes. I wanted to tell you that in a week, I'm sure that . . . we'll need him to bring us food here again.

O-S:   That's fine.  I'll send, send the guy a message so he can go there.

C-G:   Right, and I just wanted to say if, if, if you want, I can give you what I have or leave it for the next week.

O-S:   Okay, up to you.  Send the guy or I can do it, so he can take it right away.

38.    Subscriber records for (xxx) xxx-6064 come back to "Kenia Guardado" at an address in Gaithersburg, Maryland.  Previous phone numbers that law enforcement has confirmed that **Jorge OROZCO-SANDOVAL** has used have been subscribed in this same name.  Based on this, as well as the conversation between **COVARRUBIAS-GONZALEZ** and UM-2 in which they referenced "Jorge," investigators confirmed that **OROZCO-SANDOVAL** is the user of (xxx) xxx-6064.

### *Interception of OROZCO-SANDOVAL*

39.    After identifying **OROZCO-SANDOVAL** as the user of (xxx) xxx-6064, law enforcement reviewed previous communications intercepted on of **COVARRUBIAS-**

14

**GONZALEZ**'s telephone and confirmed that **OROZCO-SANDOVAL** had been in communication with **COVARRUBIAS-GONZALEZ**.

40.     On or about February 12, 2022, at approximately 5:55 p.m., **COVARRUBIAS-GONZALEZ** received an incoming phone call from **OROZCO-SANDOVAL**.  During this phone call, the following conversation occurred:

C-G:    Yes, let's see let's see if- I think that around sometime next week, there is going to be something in case you need anything, right?

O-S:    No, no, no, thing is I, I was just calling earlier because the guy is going over there. . . . Mind you, that was why I was asking you if you needed work, then he can take it.  But, if not, whatever you say.  Otherwise, once he is over there.

Based on my training, experience, and knowledge of this case, I believe that **OROZCO-SANDOVAL** was offering a customer ("the guy") to purchase narcotics from **COVARRUBIAS-GONZALEZ**.

41.     Later in the conversation, the following exchange occurred:

O-S:    You know, I had a complaint today with a guy- a man.

C-G:    Really?

O-S:    He told me that it came out kind of stained, but they have not come out stained, like that, right? Or did you, did you...

C-G:    No, no, no...none of that [*unintelligible*] that they are coming out kind of, kind of short, that's all.  But no, not that.

Based on my training, experience, and knowledge of this case, I believe that **OROZCO-SANDOVAL** was talking about a complaint he received about the quality of his narcotics and asked if **COVARRUBIAS-GONZALEZ** had noticed any issues.  I believe **COVARRUBIAS-GONZALEZ** replied that he had not noticed a problem with quality, but that the quantity provided was less than he expected to receive.  The conversation continued:

O-S:   Uh-huh, he told me four hundred (400), that's what he said.

C-G:   Oh?

O-S:   I told him that was fucking too much. . . . All together-I told him that is impossible.

C-G:   Yeah, no, no, no…no. Not that, right?

O-S:   I imagine it is between the two (2). It was the workers. Yes, between the two (2) they took 200, it's too much, too much.

C-G:   Alright, alright.

O-S:   I'm going to, I'm going to-and he wants me to exchange them.

C-G:   Yes, yes, yeah.

O-S:   But…but I feel it's too much. I don't know, it seems kind of weird to me.

C-G:   Yes, well, it's a lot, right?

O-S:   Yes, too much. . . . I mean, like that as a complaint, man, there could be one missing like that, but so many?

C-G:   Yes, no, well, if I -the most is like 32, 32 little points.

O-S:   Yeah.

C-G:   Yes, like one.

Based on my training, experience, and knowledge of this case, I believe that **OROZCO-SANDOVAL** was explaining that the customer who had complained wanted him to replace a quantity of narcotics, but that he felt it was too much.

42.   On or about February 22, 2022, at approximately 5:53 p.m., **COVARRUBIAS-GONZALEZ** placed an outgoing phone call to **OROZCO-SANDOVAL**.  After the men greeted each other, the following conversation occurred:

O-S:   Do you remember what you asked?

C-G:   Yes, uh-huh, about … Well, it's about the other thing, okay?  Do you have a way, or not?

16

O-S:   It's your day [*unintelligible*].

C-G:   Okay. Well, I have a friend that … he is a friend who wants, who wants…He only wants that type, okay?

O-S:   However, he will need … If you want if you can send it to me, so …"

C-G:   He can get it. The thing is that … Well, we don't really have to do much, just, just take care of that.

O-S:   It is … not as recommended.

C-G:   The thing with this guy is… is … this guy is [unintelligible], hopefully he does not go elsewhere … if you noticed, he's the one who always calls for it, Anyways, you don't have to send me anything, all we have to do is to arrange it.  You need to confirm that there is something, so I can, I can make a phone call, okay?

O-S:   What we can do is that once it arrives, I'll send you one.  You then can show it to him, you do your thing.

C-G:   One? A whole one?

O-S:   Well, if you can take care of it.

C-G:   Well, it would be better … Now, I have worked with this friend before … He, he… if it's good.

O-S:   No, it's good.

C-G:   Then it shouldn't be a problem.

Based on my training, experience, and knowledge of this case, I believe that when **OROZCO-SANDOVAL** referred to "one," and **COVARRUBIAS-GONZALEZ** referred to "a whole one," they were talking about one whole kilogram of narcotics.  I further believe that when **OROZCO-SANDOVAL** stated, "it's good," he was vouching for the quality of the narcotics.

43.     **OROZCO-SANDOVAL** then stated, "I got five of those ones last time." **COVARRUBIAS-GONZALEZ** said "Okay," and the conversation continued:

O-S:   But they went fast.

C-G:   Oh, really?

O-S:    I did tell, I did tell you right?

C-G:    Yes, Yes, you told me about it [*unintelligible*] and told him about it. When I talked to the guy, he … he … Well, I gave him some of what we had, but he did not want it. So, this friend of mine, do you remember me telling you about him? … about Macanas?

O-S:    [*acknowledged*]

C-G:    This motherfucker had some good stuff, right?  So, he ended up helping me with one.  Well, this guy only works with halves.  So, the thing is that I only went there once, and when I tried to go back again, that shit was gone.  He had nothing.

Based on my training, experience, and knowledge of this case, I believe that **OROZCO-SANDOVAL** was discussing one of his cocaine suppliers who provided him with five kilograms of narcotics on one occasion.  I further believe that **COVARRUBIAS-GONZALEZ** had a supplier whose stock was of good quality, so when he went back to purchase more narcotics, his supplier was already sold out.  The conversation continued:

C-G:    Yes. The issue is that this fucking guy has been calling and calling me for about fifteen days. You know when people get desperate. They call, and call, "Is it ready? Is it ready?

O-S:    Uh-huh.

C-G:    That's when I asked you about it. I told him about not having that one … So, you just need to tell me when, when you would get it.

O-S:    In a few more day. If not this week, then the next one.

C-G:    Once you get it, I'll be able to make the phone call.

Based on my training, experience, and knowledge of this case, I believe that **COVARRUBIAS-GONZALEZ** had a customer waiting on **OROZCO-SANDOVAL**'s cocaine to arrive.

## CONCLUSION

Based upon the foregoing facts, I submit that there is probable cause to believe that beginning in or around April 2021, and continuing to the present Isidro DURAN-VELAZCO, Jose COVARRUBIAS-GONZALEZ, Claudia SALINAS-MORENO, Carlos RAMIREZ-CORTEZ, and Jorge OROZCO-SANDOVAL knowingly and intentionally conspired to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

Respectfully submitted,

Steven M. Kahle
Task Force Officer
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on May 13, 2022.

Theresa C. Buchanan
Digitally signed by Theresa C. Buchanan
Date: 2022.05.13 14:46:34 -04'00'

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

19